**Madolyn L. CRUMPTON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 89–3128.**

United States District Court,
District of Columbia.

Feb. 14, 1994.

Charles S. Mitchell, Fairfax, VA, for plaintiff.

Edith S. Marshall, Asst. U.S. Atty., Washington, DC, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

The above action was tried to the Court on the issue of liability alone from June 14, 1993 through June 18, 1993. After the transcript of the trial was made available to counsel, proposed findings of fact and conclusions of law were submitted by the parties on December 6, 1993. After full consideration of these proposals and with full access to the transcript of the trial, the Court adopts the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. This is a case brought under the Federal Tort Claims Act, by the plaintiff Madolyn L. Crumpton. She is the widow of Colonel Alfred T. Crumpton who died by suicide on January 29, 1986 at the Picatinny Arsenal in New Jersey. Crumpton was a career Army officer of 23 years service.

2. Plaintiff's suit is for the infliction of intentional and negligent distress allegedly suffered by plaintiff from the defendant's release pursuant to requests under the Freedom of Information Act (FOIA) of certain information concerning the allegedly illegal activities of the deceased Crumpton during the years 1984 and 1985, when he was stationed in the United Kingdom (UK).

3. After Colonel Crumpton's death, plaintiff returned and resumed her domicile in the State of Texas.

4. Plaintiff complains of three distinct reports which were released to the press after her return to Texas.

## A. *The AMC Report of Investigation (ROI)*

5. Sometime prior to May 9, 1985 (some eight months after the Crumptons had departed the UK) allegations that Col. Crumpton had engaged in certain violations of travel regulations and in the improper receipt of gratuities were orally transmitted to Major General Carl McNair, then Army Deputy Chief of Staff for Combat Development, Training and Doctrine Command in the UK. Pursuant to the advice of his staff Judge Advocate, McNair instructed his Inspector General to forward the allegations · to the Inspector General of the Army Material Command (AMC–01G), the immediate major command authority of Col. Crumpton. Col. Robert Barrett, a member of the AMC Inspector General's Office, was assigned to conduct an inquiry concerning these allegations.

6. To this end, interviews were conducted of persons located in both the UK and the United States (US).

7. The basic allegations which were the subject of the AMC–01G inquiry were:

a. That Col. Crumpton had accepted a pleasure trip from a contractor while Commander of the U.S. Army Research, Development and Standardization Group in London, UK.

b. That Col. Crumpton's wife had accepted an oil painting as a gift from a contractor.

c. That Col. Crumpton had "padded" his local travel vouchers to make up for money spent on entertaining.

8. Col. Crumpton was the sole object of Barrett's AMC–01G inquiry.

9. Because AMC–01G's office lacked the authority to investigate criminal activities, the AMC report and interview notes were furnished to the Army Criminal Investigation Division (CID) for use by that authority in its investigation into possible criminal activity by Col. Crumpton.

## B. *The Two CID Reports of Investigation (ROIs)*

10. Upon referral by the AMC–IG's office, the Army CID conducted a criminal investigation into the allegations concerning Col. Crumpton's activities. CID Agent Sidney Younger had primary responsibility for the conduct of this investigation. A separate investigation was also conducted in the details and circumstances of Col. Crumpton's death.

11. Plaintiff, Madolyn L. Crumpton, was not the subject of any investigation by the CID, nor a "suspect" under criminal investigation. Her activities were inquired into only insofar as those activities related to allegations of possible misconduct on the part of her husband. Since the plaintiff, a civilian, did not fall within the scope of the Uniform Code of Military Justice or of Army Regulation 600–50, it was not within CID's jurisdiction to conduct an investigation of her. With respect to the allegation of plaintiff's conduct concerning the receipt of gratuities from contractors, plaintiff's conduct was relevant only to a determination of whether Col. Crumpton might have violated standards of conduct applicable to himself.

12. On December 10, 1985, CID Agent Younger, with CID Agent Charles Humphrey also in attendance, interviewed both Col. Crumpton and the plaintiff at the Picatinny Arsenal, New Jersey. In conjunction with these interviews, Agent Younger prepared, and both Col. Crumpton and plaintiff executed sworn statements reflecting what Younger regarded as the substance of their respective interviews. These sworn statements were not a verbatim account of the interviews, nor did they reflect the entire substance of everything that was said. At the end of her interview, plaintiff read the statement Younger had prepared and was given an opportunity to add to or correct the statement. Thereafter, she signed the statement Younger had prepared. Col. Crumpton was given a similar opportunity with respect to his statement.

13. In his statement of December 10, 1985, Col. Crumpton admitted that he had "invented" a TDY (Temporary Duty) trip to Houston for the purpose of defraying the cost of travel related to arrangements for his father's funeral. He also stated he had made

"mistakes" on certain travel vouchers submitted to the government for payment.

14. After December 10, 1985, the date of his interview with Agent Younger, Col. Crumpton wrote his commanding officer, Brigadier General Beltson, stating that his duplicative claims for travel and lodging on the TDY and PCS vouchers were "inadvertent."

15. On January 29, 1986, Col. Crumpton committed suicide at his quarters by hanging himself. His body was discovered by his 12 year-old daughter, Jennifer, and a young friend. These facts were reported in several newspapers printed shortly after Col. Crumpton's death. These releases to news reporters were not made pursuant to FOIA requests and are not to be confused with later releases of information which form the basis for this litigation.

16. At the time of Col. Crumpton's death, the CID Report of Investigation (ROI) of travel fraud and other misconduct had not yet been completed.

17. Col. Crumpton's death gave rise to a substantial amount of media and congressional interest as well as speculation since it concerned a high-ranking military officer engaged in weapons research and development at an important military installation.

18. As stated in Finding of Fact No. 10, the CID also conducted an investigation into Col. Crumpton's death. This duty was assigned to Special Agent Charles E. Humphrey.

19. The ROI into Col. Crumpton's death included detailed descriptions and photographs of the death scene, the body of the deceased and the autopsy. Also included were interviews of witnesses, including Mrs. Crumpton, and hers and her daughter's reactions to the death and actions taken when the body was discovered.

20. The CID investigation into the fraud allegations continued after his death despite the fact that no action could be taken against Col. Crumpton. This was because of a lingering suspicion that further investigation might bring to light matters more serious than those already disclosed.

21. The ROI for fraud was finally completed on March 12, 1986. It concluded that Col. Crumpton had engaged in misconduct by submitting false travel claims, by accepting gratuities from contractors and by authorizing and using ostensibly official travel to defray expenses for personal reasons.

22. This ROI included references, in summaries of witness interviews, to allegations that the Crumptons had received an oil painting as a gift and that Mrs. Crumpton had allegedly made some comment about the "padding" of expenses for local travel. Included as attachments to the summary report were the statements of witnesses, as well as the statements of the Crumptons of December 10, 1985, and Richard Barrett's memorandum concerning the AMC–01G inquiry.

## C. The Releases Pursuant to FOIA Request

23. On January 27, 1986, two days before Crumpton's death, Phil Garber of the Morristown (NJ) Daily Record made a FOIA request for a copy of the CID ROI for fraud. He was originally told that the information requested could not be supplied because the fraud investigation was still continuing. Garber later amended his January 27, 1986 request to include the ROI of death as well as the ROI for fraud. He was given a redacted copy of the ROI of death in a response from CID dated April 28, 1986.

24. On February 18, 1986, Lawrence Ragonese, a reporter for the Newark Star Ledger, made a FOIA request for both the ROI for fraud and the ROI of death. In response, the CID on April 29, 1986, provided redacted copies of the ROI for fraud and the ROI of death.

25. On May 21, 1986, the CID provided Joseph Fisher, also a reporter for the Morristown Daily Record, with redacted copies of both ROI reports in response to his FOIA request. The same material was redacted from each of the copies of the ROIs concerning Col. Crumpton that were provided to the reporters pursuant to FOIA request.

26. The Report of Inquiry that was prepared by Colonel Barrett of the AMC Inspector General's Office was included as an exhibit to the CID ROI for fraud. Because of this, the CID did not release this portion

of the ROI for fraud directly but referred it to the IG's office for review and direct response. By responses dated May 16, 1986 and June 6, 1986, respectively, the IG provided redacted copies of the AMC–IG Report of Inquiry to Ragonese and Fisher.

27. Jeffrey Porter, a civilian employee of the CID was given the responsibility of performing the initial review of the ROIs for fraud and of death sought by the media requesters and to recommend the extent to which that material should be released.

28. Prior to making his recommendations for release, Porter referred the ROI for fraud to the CID's Economic Crimes Division for a "Quality Assurance" review. The Quality Assurance Review was performed by Special Agent Bobby T. Kelly. Based on his review of the ROI for fraud, Kelly concluded that it was reasonably accurate, thorough and complete.

29. After Porter's review, his recommendations were reviewed by two of his superiors, Attorney Theodore Littlewood and Col. Richard Russell, the Staff Judge Advocate for the CID. It was Russell's role, as technical advisor to the commanding general, to make the legal determinations as to whether the requested documents should be released.

30. In making his recommendations for release, Porter assessed the public interest in the requested material which referenced Mrs. Crumpton or implicated the privacy interests of Col. Crumpton's family. He gave significant weight to the public's interest in information about persons, particularly a military commander in a senior leadership position. He also considered the public to have an interest in information showing that every allegation concerning the conduct of an official such as Col. Crumpton had been explored.

31. In this request, he concluded that Mrs. Crumpton's sworn statement, including references to such matters as the oil painting, her accompanying her husband on contractor-funded weekend vacations, and the alleged use of travel funds for entertainment, were not sufficiently private to outweigh the public's interest in knowing that every alle-

gation concerning possible misconduct by Col. Crumpton had been investigated.

32. With respect to portions of the ROI of death, Porter acknowledged that they contained information "painful" to surviving family members, but concluded that the applicable privacy interests to be outweighed by the public's interest in knowing that the investigatory finding of suicide was supported.

33. On the other hand, Porter regarded some of the privacy interests of plaintiff to outweigh any legitimate public interest in disclosure and accordingly withheld certain information given Agent Humphrey concerning plaintiff's observations of and communications with her husband prior to his death, the childrens' reactions upon discovery of his body, Crumpton's suicide note, portions of the autopsy report, as well as photos of the body, death scene and autopsy.

34. Porter did not consider the release of the requested information to be prohibited from disclosure because of the Privacy Act. He considered this Act not to apply because Col. Crumpton was dead and because the requested records were not filed in any system of records from which they were retrievable by the name or personal identifier of the plaintiff.

35. After conducting his own independent review and assessing the public interest in the criminal investigation, Col. Russell concurred in Porter's recommendations regarding the release of the requested information. Russell, like Porter, did not regard the prohibitions of the Privacy Act as applicable to the facts of this case.

36. The information released in the CID Report for Fraud included plaintiff's sworn statement and references to her activities in the context of the allegations underlying the investigation.

37. The information released in the CID Report of Death included a portion of the autopsy report (the autopsy "protocol") and some description of Col. Crumpton's body and his wife's efforts to administer CPR.

38. The AMC–01G report of inquiry was reviewed by Frederick Thaczuk, the Inspector General's Office Records Release officer.

Thaczuk's recommendations were approved after review by several lawyers of authority.

39. After considering the privacy interests of Col. Crumpton's family and particularly those of plaintiff, Thaczuk recommended release of the AMC–01G report with certain redactions, but without any redaction for references to the allegations concerning plaintiff's receipt of the oil painting, her comments about "local travel", and mention of alleged weekend trips at contractor expense.

40. Thereafter, in response to complaints and allegations made by plaintiff to the Secretary of the Army, a subsequent investigation into Younger's investigation for fraud was conducted by Colonel Elton Schauf. While Schauf found that Younger's ROI for fraud was "flawed" in certain respects, these "flaws" did not relate to any of the allegations concerning, or references to, plaintiff's alleged activities or statements.

41. On or about May 6, 1986, Mrs. Crumpton became aware that the Reports concerning her husband had been released to the press. Plaintiff offered evidence at trial that she was extremely emotionally upset when she learned of these releases and for a period of time withdrew from contact with other people.

42. On May 5, 1988, an administrative claim under the Federal Tort Claims Act was filed on plaintiff's behalf. On May 17, 1988, said claim was denied. On November 17, 1989, plaintiff filed her complaint in the present action. The original complaint has been twice amended.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1346 (United States as defendant) and 28 U.S.C. §§ 2671 et seq. (actions for damages against the United States under the Federal Tort Claims Act).

2. This is not a case under the Privacy Act. The releases complained of are not covered by the Privacy Act because Col. Crumpton is deceased and because all of the records released were contained within systems of records retrievable in the name of plaintiff's husband or by some identifying number, symbol or other identifying particu-

lar assigned to him. The Privacy Act and its prohibitions do not apply to any of the information released in this case.

3. This is not a suit under the Freedom of Information Act (FOIA) which is a disclosure statute containing several exemptions from mandated disclosure, specifically Exemptions 6, 7(C) and 7(D).

4. Rather, this is a suit under the FTCA in which plaintiff claims that the release under FOIA of certain information was improper and caused her severe emotional distress. Under the FTCA, the government waives its sovereign immunity from suit in tort for money damages.

5. This waiver of immunity is subject to several exceptions, two of which are relevant to the FOIA releases which are the basis of the wrongs alleged by plaintiff.

6. The FTCA provides in pertinent part, at 28 U.S.C. § 2680 that:

[t]he provisions of [the FTCA] ... shall not apply to—

(a) Any claim based upon an act of omission of an employee of the Government, *exercising due care*, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.* (emphasis supplied).

This section encompasses two exceptions to the FTCA: the due care exception and the discretionary function exception.

7. The "discretionary function" exception excepts from the coverage of the FTCA alleged tortious conduct arising from the performance or nonperformance of a governmental function involving the exercise of judgment, or from execution of a decision involving a permissible element of judgment or choice.

### A. The "Due Care" Exception

8. The "due care" exception applies where the allegedly tortious conduct is com-

prised of a government employee's act or omission occurring in the course of executing statutory or regulatory provisions, where "due care" has been exercised by the employee.

■ 9. The testimony and other evidence adduced at trial of this matter establishes that the releases of information on which plaintiff bases her action occurred in the context of the efforts of various employees of the Department of the Army to fulfill their statutory and regulatory duties under the FOIA. This evidence establishes that the Reports of Investigation at issue were released, in partially redacted form, after careful and time-consuming review and consideration by persons responsible for processing FOIA requests to the CID and the Inspector General's Office. Consideration was given to the question of whether withholding of requested material was justified on the basis of the statutory exemptions from mandatory FOIA release, specifically including the exemptions pertaining to material which would if disclosed represent an unwarranted or "clearly unwarranted" invasion of personal privacy. The privacy interests of plaintiff in the requested material were specifically assessed and considered. The evidence further establishes that in each case the recommendations as to what should be released and what withheld under FOIA exemptions underwent several layers of review before any final release determination was made.

10. The releases to which plaintiff objects were clearly made in the context of an agency's fulfillment of its statutory duties to respond to requests under the FOIA, and that the involved employees exercised due care in the manner in which the requests were processed and the release determinations made. Accordingly, plaintiff's claim falls within the "due care" exception from the FTCA, and the defendant has sovereign immunity from this suit for damages.

B. *The "Discretionary Function" Exception*

■ 11. We also conclude that the "discretionary function" exception from the FTCA also applies to the undisputed facts of this case. The factual record is clear that the government employees who were responsible for recommending and determining the extent of the release of the investigative reports at issue used their judgment in assessing where and whether personal privacy interests of the plaintiff were involved in the potential release of particular information. They were also involved in balancing the public interest which they judged to be associated with disclosure of information against the private interests in withholding (that is, at least where interests in personal privacy were considered to exist). We again hold that this assessment of personal privacy, as well as the balancing of public interest against such personal interests, was an inherently judgmental and discretionary task well within the meaning of the FTCA's discretionary function exception.

12. The involved federal employees had the statutory responsibility to use their judgment in making essentially subjective assessments of the nature and magnitude of the interests associated with release versus nondisclosure of the requested information. The determination of whether the FOIA's (b)(6) and (b)(7)(C) exemptions apply to any particular material plainly involves an element of judgment or choice in deciding whether personal privacy is indeed at issue and whether intrusion on that privacy may be "unwarranted".

13. The decision of whether to release matter notwithstanding its exempt status is a matter of agency discretion. This makes applicable the "discretionary function" exception which like the "due care" exception also deprives this Court of jurisdiction over plaintiff's FTCA claim.

An order consistent with the foregoing has been entered this day.

### ORDER

Consistent with the Findings of Fact and Conclusions of Law entered this day, it is by the Court this 14th day of February, 1994, hereby

ORDERED that judgment be entered in favor of defendants; and it is

ORDERED that each side shall bear its own costs; and it is

ORDERED that the above action is dismissed with prejudice.